424

5-311                                                         266 S. W. 2d 294

Opinion delivered April 5, 1954.

*Collins, Core & Collins,* for appellant.

*Winfred Lake,* for appellee.

GRIFFIN SMITH, Chief Justice. The appeal is from a decree that Mike B. Carroll and other heirs of John W. Carroll were owners by adverse possession of 19.95 acres in section 23, township nine south, range thirty west, Sevier county. The adjudication was the result of a suit by Dierks Lumber & Coal Company to remove clouds created by Carroll claims.

December 9, 1901, John W. Carroll conveyed *part* of the east half of the northeast quarter of section twenty-three to A. C. Steel, trustee for DeQueen & Eastern Railroad Company, but in addition to the "part" description the land is shown to be in range 39 west. Seventy acres were mentioned, the consideration being that the railroad company, not later than six months after completing its line, should lay off and plat the tract into lots or blocks "to the number and value of one-half of the area of said tract". Failure of the railroad company to plat the area worked a forfeiture of the conveyance.

October 9, 1902, Carroll conveyed a 100-ft. right-of-way to the railroad company. January 13, 1903, the same grantor, by what is termed a correction deed, conveyed to Steel, trustee, lands designated by metes and bounds. There was reference to the railroad company's agreement of November 27, 1901, with A. C. Steel, J. S. Steel, T. W. McCown and others to construct, maintain, and operate the railroad through Lockesburg. By deed of January 10, 1913, Steel, as trustee, conveyed the land in controversy and other property to the railroad company. December 15, 1949, the railroad company conveyed to Dierks.

A chart shows 14.35 acres to be north of the railroad right-of-way, while 5.60 acres lie south 890-ft. along the boundary of sections 23 and 24, extending to Highway No. 24. The remainder is south of the highway.

It is quite clear that Carroll and officials· of the railroad company contemplated extensive townsite development and anticipated that profits would accrue to each. A plat, not recorded, shows that all of the area constituting the 19.95 acres contended for was within the project, (also land in section 24) and twelve acres west of the two tracts comprising 14.35 acres in section 23. There was objection to the introduction of the plat —an objection that would be tenable if the purpose were to identify a particular lot or block. We are cited to *Clark* v. *Gridiron*, 222 Ark. 151, 257 S. W. 2d 561. It will be noted that in that case the appellant himself stated that

he did not know where the lot was. It was also stated that the appellee held a deed to the land embracing block twenty-four, and that the description was by metes and bounds.

On March 5th, 1903, the railroad company conveyed to John W. Carroll, and to his heirs and assigns, sixty lots designated by numbers, and seven blocks. Some of the blocks in the area north of the railroad are irregular, and the deed of 1903 appears to have been an attempt to equalize values by alternate selection. This, of course, left Carroll with the record title to land described by blocks and lots referable to a plat not on file. Seemingly the uncertainty was of mutual recognition, for in 1921 Carroll conveyed to the railroad company all of the lots and blocks that were mentioned in the deed of March 5th, 1903. In exchange the railroad company quit-claimed to Carroll other lands embraced within the original 70 acres dealt with when the promotion plans were undertaken. Effect of this deed was to convey to the railroad company the exact acreage contended for by Dierks under its 1949 deed.

Since the Chancellor found in favor of the defendants on the grounds of adverse possession alone, this opinion will be confined to that issue.

That some of the witnesses were uninformed regarding the land in controversy cannot be doubted. Even one or two of the defendants did not know where the boundaries were, or how many acres were involved. This is easily understood when consideration is given the fact that John W. Carroll owned 120 acres east of Lockesburg. Some of it adjoined the R. A. Gilliam home place and the Ed Williamson lands.

The contention of appellees that they used the area in controversy for pasturage, that they had cut wood and timber from it, and that some of it had been leased should be weighed in the light of actualities.

The plat, claimed by appellant to have been used for purposes of illustration while examining witnesses, but

not introduced as an exhibit, was referred to by each side while the cause was being argued orally here, and for all practical purposes it is before us. It shows that the north and south lines are 1320 feet, with two charted 10-acre tracts, each 660-ft. x 660-ft. Tract A is east of tract I. Admittedly tract I is part of the retained Carroll estate, as is that portion of tract II immediately south of tract I and north of the railroad. Tract A (10 acres), and tract B, containing 4.35 acres each north of the railroad and east of tracts I and II, were conveyed by Carroll to the railroad company in 1921, as were also tracts C and D to the south.

There is a creek approximately 327 feet east of the railroad right-of-way. The railroad separates tracts B and C. The creek is spanned by a trestle. From each side of this structure a fence connects to a north-south fence that delineates sections 23 and 24. Southward from the railroad where it crosses this line and beginning at a point 890-ft. from the railroad, the fence runs northwesterly along Highway 24 to a point approximately 300 feet from the western side of what appears to be the 60-acre parent tract. The fence then veers north by east, describing a gradual curve northwest to a cattle guard on the railroad. This guard separates tract II (owned by appellees) from land to the south.

West of tracts I and II there is the Gilliam fence, and north, extending across tracts I and A there is the Frank Steel fence. The McWhorter field is east of tract A.

As to acts of dominion, such as cutting wood, taking timber, and like transactions, J. B. Williamson was perhaps the most positive witness used by appellees. He had married a daughter of J. W. Carroll. The heirs of Carroll, said Williamson, had sold timber from the land in controversy on four occasions. He didn't remember the initial invasion—it was "away back". The timber was sold to "somebody"—a man named Friday, he thought. His best recollection was that this occurred in 1933 or

1934. J. T. Vaught and others testified that the disputed area was generally referred to as the Carroll lands. The railroad company's roadmaster crossed the lands frequently; and, say appellees, there was nothing to prevent him from noticing that the timber had been cut.

Vaught's timber-cutting had been at the suggestion of Williamson and sale had been made to Dierks. The first transaction occurred in 1940. All told, the witness thought the value of the timber was between $200 and $300. No doubt the acreage had been used for pasturage and the Carrolls had profited from these isolated occurrences, but there was no fence between the disputed tract and some of the property admittedly owned by the Carrolls; nor is there any evidence that taxes had been paid by the Carrolls. Tax receipts showing payments by Southern Land & Townsite Company beginning with assessments for 1935 and continuing through 1945 are in evidence. Dierks began paying in 1946, but one description is "part" of the northeast southeast, etc. Earlier assessments were against lots. None of the receipts is of major significance.

A contention that title has ripened through adverse possession usually involves facts pertinent to the particular claim. General rules are well known. Where an act, standing alone, is conclusive of intent when viewed by the so-called reasonable man, the determination is not difficult; nor is the problem vexatious where concurring operations are of a character that should impress upon the local public or the record title claimant the reasonable conclusion that the things being done were in derogation of the owner's rights. In these cases an adjudication is much easier than it is where reliance is placed upon sporadic conduct, incidental entry, and tactics difficult to distinguish from trespass infrequently committed and remotely spaced in point of time.

Mr. Justice Butler, speaking for an undivided court in Sanderson v. Thomas, 192 Ark. 302, 90 S. W. 2d 965, mentioned our holdings that adverse possession could not be predicated upon irregular unauthorized acts of one

who enters another's land for the purpose of cutting firewood, making rails, posts, and boards; and this is true even though the trespasses recurred "through a considerable period of time".

In order to acquire title to woodland under claim of adverse possession there must be actual use of the land of such unequivocal character as to reasonably indicate to the owner visiting the premises during the statutory period that such use and occupation indicate an appropriation of ownership in another. This statement of the law was declared by the Supreme Court of Maine in *Adams* v. *Clapp,* 87 Me. 316, and was quoted approvingly in *Earle Improvement Company* v. *Chatfield,* 81 Ark. 296, 99 S. W. 84. See also *Norwood* v. *Mayo,* 153 Ark. 620, 241 S. W. 7.

We think the chancellor was in error in finding that the disconnected acts of the Carrolls were sufficient to put the railroad company on notice that the land was being appropriated under a claim of right; and, of course, Dierks stands in the railroad's title position. Appellees are descendants of John W. Carroll whose purpose to have the property divided and to clarify uncertainties incidental to the original deeds—deeds executed at a time when the townsite promotion appeared promising—stand out too prominently to admit of serious controversy. It follows that the decree must be reversed and the cause remanded with directions that title be quieted in the plaintiff below.

Justice WARD dissents.

WARD, J., dissenting. I am firmly convinced this court should not reverse the Chancellor who had a better opportunity than we have to weigh the testimony in a fact situation which the majority opinion admits is not easy to adjudge.

*Equities..* The equities involved in this case are such that if there is any doubt about the weight of the evidence it should be resolved in favor of appellees. A quick glance at the overall picture brings these equities into striking relief.

John W. Carroll [through whom appellees claim as heirs] owned 70 acres of land near Lockesburg in 1900. In 1901 he deeded it to A. C. Steele, Trustee. [We know from the record that he was trustee for the railroad company.] The sole consideration to be received by Carroll was: The Railroad Company was to plot the tract of land into lots and blocks [and we can picture the sales talk the Railroad gave Carroll on the rapid growth of Lockesburg as a result of the Railroad] and deed one-half of them back to Carroll, otherwise the deed was to be void. The Railroad Company never did plot the land.

The record casts a suspicion that the Railroad Company never intended in good faith to plot this parcel of land because in 1903 Steele as trustee conveyed the land [or a large portion thereof] to the DeQueen and Eastern Railroad Company for a consideration of $2,456. It is easy to imagine that John W. Carroll was not satisfied with the conduct of Steele or the DeQueen and Eastern Railroad Company. Apparently in an effort of appeasement the said Railroad Company reconveyed to Carroll, 12 acres of land. Thus, as I see it, John W. Carroll gave the Railroad Company 58 acres of land and got nothing in return.

*Payment of Taxes.* Although we have uniformly held that payment of taxes is not a necessary element of adverse possession the majority opinion lays stress on the fact that appellant did and appellee did not pay taxes on the land in dispute. This is only partially true. An examination of the tax receipts reveals that the Railroad Company never paid taxes on the south portion of the land in dispute which amounted to 5.60 acres and perhaps more. The parcels not paid on by the Railroad Company are marked "C" and "D" on the plat referred to in the majority opinion.

*Acts of Adverse Possession.* It is a fact, though not clearly set forth in the majority opinion, that all of the land in dispute (together with the 12 acres above referred to) was entirely enclosed by fence and had been for some 40 years. The majority opinion correctly recognizes that

acts of adverse possession must be of such a nature as would reasonably be calculated to give notice of their nature to the record owner or to the world. As I read the record the weight of the testimony is to the effect that appellant did know that appellees were claiming this land adversely. They are bound to have known the land was enclosed with other land to which appellees undisputedly had record title. Several witnesses for appellees testified they cut and removed timber from the land on different occasions, and that the logs were piled up in plain view for every one to see. One witness testified that officials of the Railroad Company passed over the land practically every day for years. Another witness testified that he leased the land from appellees for a period of 9 years and used it as a pasture. Appellees testified that agents of the Railroad Company talked to them about timber having been cut and removed from the land and that they [appellees] informed them it was their land. In other ways appellees exercised unmistakable control over this land claiming to be the owners and this knowledge was unquestionably brought home to the Railroad Company. J. B. Williamson, the husband of one of the appellees, testified:

"Q. Does the Southern Gas and Electric Company have a high line transmission line across there?

"A. Yes.

"Q. From whom did they buy that right-of-way?

"A. From the Carroll estate.

"Q. Then they bought it from the heirs of John W. Carroll?

"A. That is right."

Testimony of the same witness shows conclusively that appellant and the Railroad Company knew of appellees' claim to the land.

"Q. Do you know whether or not the D. & E. Railroad and the Dierks Lumber & Coal Company once talked

with you about building a right-of-way to put a tram road across this land going south?

"A. Mr. Campbell talked to me.

"Q. Jim Campbell?

"A. Yes.

"Q. Was he connected with the DeQueen & Eastern Railroad?

"A. He was with Dierks, and I think he was vice-president of the DeQueen & Eastern. I wouldn't say for **sure**.

"Q. After talking with some of the heirs, did you report to him that they would sell him a right-of-way?

"A. Yes."

In my humble judgment the decree of the trial court is abundantly supported by the record in this case.